1

2

3

4

5

6

7

8           IN THE UNITED STATES DISTRICT COURT

9        FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   RAYMOND E. LOPEZ,                   No. C 13-0649 TEH (PR)

12            Petitioner,          ORDER DENYING PETITION FOR WRIT
                                    OF HABEAS CORPUS; DENYING
13            v.                    CERTIFICATE OF APPEALABILITY

14   G.D. LEWIS, Warden,

15            Respondent.

16   _____/

17

18        Raymond Lopez, a state prisoner, has filed this pro se

19   petition seeking a writ of habeas corpus under 28 U.S.C. § 2254.

20   Respondent was ordered to show cause why the petition should not be

21   granted.  Respondent has filed an answer, and Petitioner has filed a

22   traverse.  For the reasons set forth below, the petition is DENIED.

23                               I

24        On April 8, 2009, a Santa Clara County jury found

25   Petitioner guilty of first degree murder with personal use of a

26   weapon.  Clerk's Transcript ("CT") at 426-28.  He was sentenced to

27   26 years to life in state prison.  CT at 449-51.

28

United States District Court
For the Northern District of California

Petitioner appealed his conviction in the California Court of Appeal. On August 15, 2011, the California Court of Appeal filed an unpublished opinion affirming the judgment. People v. Lopez, No. H034631, 2011 WL 3568553 (Cal. Ct. App. Aug. 15, 2011). On December 14, 2011, the California Supreme Court denied Petitioner's petition for review. Answer, Ex. 8.

## II

The following factual background is taken from the order of the California Court of Appeal.[1]

> In October 2007, Rosa Townes and Ryan Townes were married, but they had separated. Rosa and Eric Diaz were friends, and they had been "get [ting] high together" on methamphetamine for a couple of months. They were not romantically involved. Ryan had met Diaz about three times and "didn't like him." The two men never had any arguments, but Rosa had told Diaz that Ryan did not like it that Rosa was associating with Diaz. Ryan knew that Rosa visited Diaz at his apartment, but Ryan did not know which apartment was Diaz's apartment. Ryan had seen Diaz's Ford Explorer, and Diaz believed that Ryan had slashed one of the tires on Diaz's Explorer on the evening of October 2, 2007. On the afternoon of October 3, 2007, Rosa accused Ryan of having slashed Diaz's tire. Ryan denied having done so. At about 10:00 p.m. that evening, Rosa told Ryan that she would not go home with him that night. Ryan was "hurt." He called Rosa repeatedly after that, but she did not answer her phone.
>
> At about 11:00 p.m. on October 3, 2007, Diaz picked Rosa up from the motel where she was staying and took her in his Explorer to his apartment building. They went into Diaz's second-floor apartment and used methamphetamine. After midnight, Ryan telephoned Rosa and said he knew where she was and he was outside. Ryan said he wanted to "clear the air" with Diaz about the slashing of the tire on Diaz's Explorer. Rosa and Ryan telephoned and texted back and forth, arguing. Rosa told Diaz that Ryan was outside the apartment building. Rosa had previously told Diaz that Ryan had beaten her a number of times, "nearly

---

[1] This summary is presumed correct. Hernandez v. Small, 282 F.3d 1132, 1135 n.1 (9th Cir. 2002); 28 U.S.C. § 2254(e)(1).

2

killing her sometimes." Diaz wanted someone to pick up Rosa and take her home. He figured that Ryan would leave if Rosa left.

Diaz tried to call his cousin defendant on his cell phone. Diaz also sent a text to defendant that read: "Cousin, I need help ASAP, no joke." Rosa had met defendant several times at Diaz's apartment. Eventually, Diaz reached defendant by telephone and sought his assistance. Defendant told Diaz to "relax" and "wait it out." Diaz sent defendant additional texts and continued to telephone him. "I told him someone was out there and we needed to get out of there, that he might have a weapon, I'm not sure. I was scared, and my daughter was there, and I didn't want anything to happen to me or my daughter or Rosa." Diaz's three-year-old daughter was in the apartment with Diaz and Rosa. Diaz told defendant that the man outside "could be dangerous" and that he was afraid that this person would "hurt" him. The reason Diaz thought Ryan might have a weapon was because he believed Ryan had slashed his tire.

A couple of Diaz's phone calls to defendant's cell phone were answered by Diaz's other cousin Vincent Lopez. Diaz told Vincent the same thing he had told defendant, and Vincent also told him to "relax" and "wait it out." Vincent expressed concern that this "someone" might have a gun or a knife. Because by now Diaz could hear Ryan yelling outside and knocking on doors downstairs, he told either defendant or Vincent that "a dude was outside acting crazy." Diaz told Vincent that the man outside had slashed the tire on his vehicle and was a "crazy motherfucker." He asked Vincent to come and pick up Rosa. Diaz never described Ryan to either of his cousins, and neither of his cousins had ever met Ryan.

Meanwhile, Rosa texted Ryan that he "needed to leave" because Diaz had "called his cousin" and "I was scared for him." Ryan responded that he "wasn't going anywhere." They continued to text back and forth for about an hour. She falsely told him she had called the police, but he did not leave. At some point, Rosa heard Ryan yelling outside for about 10 minutes. Shortly after 2:00 a.m., Ryan knocked repeatedly on the door of one of the downstairs apartments in the building. The resident was awakened, and she came to the door. Ryan asked "if Rhonda was there." She told him "no one is here by that name." Ryan said: "Thank you, I'm sorry to bother you." He did not sound angry, and he was not speaking loudly.

Two hours after Diaz's first text to defendant, defendant texted Diaz "we're going to be on our way soon...."

3

1
2
3
4
5
6
7

Vincent also texted Diaz: "We are going to try and do something right now." Diaz texted Rosa that his "cousins were on the[ir] way." Rosa heard Ryan's yelling stop. About 10 to 15 minutes later, Rosa heard Ryan loudly say "whoa," followed by sounds of "a fight" outside. Rosa looked out the window and saw two males and a female "around" Ryan. The female was standing to the side, while one male was in front of Ryan and the other was behind him. "It looked like they were punching him." Ryan was "[t]rying to fight back." Rosa opened the apartment door and started screaming. She saw the two males and the female leaving the scene, and one of the males looked up at her. Rosa recognized him as defendant.

8
9
10
11
12
13

Rosa ran to Ryan, who said "baby, I got stabbed. They stabbed me." Rosa ran back toward Diaz's apartment to get her phone. On her way, she saw a knife lying on the ground next to the tire of Diaz's Explorer. Rosa picked up the knife because she thought it would "help" to "get justice" for Ryan. She then retrieved her phone and returned to Ryan. Rosa dropped the knife after she returned to Ryan because she needed her hands free to call 911. Diaz came downstairs and moved his Explorer before the police arrived because he did not want the police to see his Explorer near Ryan.

14
15
16
17

When the police arrived, Ryan was bloody and unresponsive. His body was lying on some bushes. A police officer attempted CPR, but Ryan did not respond. A closed knife was clipped to the inside of Ryan's right front pants pocket. There was no blood on the knife. A large knife was found on the ground a few feet from Ryan's body. There was no visible blood on this knife.

18
19
20
21
22

Diaz told the police that "it was [defendant and Vincent] there." Defendant was arrested on the evening of October 4. Vincent, who is defendant's uncle, was in the same car with defendant when the police stopped the car. When the police asked for his name, defendant provided his name and said "you're here for me." Defendant had a bandaged wound on one hand. The bandage covered a cut on his thumb. He had no other injuries.

23
24
25
26
27

An autopsy determined that Ryan died from stab wounds to his head, neck, and torso. He had 20 "sharp force injuries," which included both stab wounds and slash wounds. Stab wounds are deeper than slash wounds. Ryan had suffered a stab wound to the back of his neck, a deep stab wound to his upper right chest, which penetrated a large artery and a lung, 13 stab wounds to his back, and a stab wound to the back of his upper right arm. Half of the stab wounds to his back had penetrated the chest

28

4

cavity and entered his lungs.  Each of these stab wounds was potentially fatal.  There were also multiple slash wounds on his face and head, and slash wounds to his right hand. Ryan was under the influence of methamphetamine at the time of his death.  He was five feet, seven inches tall, and he weighed 193 pounds.  Defendant was six feet, one inch tall and weighed 225 pounds.

Defendant spoke to the police 10 days later.  He told them that he was at Diaz's apartment building when Ryan was killed, but he did not see the killing.  He heard the screams and came upon a man and a woman fleeing the scene, so he too ran. Defendant told the police that Diaz had told him that Ryan "had a gun."

[Defense Case]

Defendant was charged with Ryan's murder.  The only defense witnesses at trial were defendant and an expert on the effects of methamphetamine on human behavior.

The defense expert testified that a person under the influence of methamphetamine had an increased "propensity for violence" and would be "highly unpredictable."  He also testified that "methamphetamine motivated or influenced violence ... typically appears to be unprovoked."  "[T]hey may interpret [something] as offensive or threatening in some way...."  Such a person would be "primed for fighting."  However, he testified on cross-examination that such a person would also be "fearful" and "more prone to run away, depending on the circumstances."

Defendant testified at trial and admitted that he had stabbed Ryan.  He asserted that he had taken methamphetamine earlier that day.  He testified that he received "urgent" messages over a couple of hours from Diaz, who sounded "scared."  Defendant was aware that Diaz, his daughter, and Rosa were in Diaz's apartment. Rosa had told defendant previously that her husband had slashed a tire on Diaz's vehicle.  Defendant assumed that a knife would have been used to slash the tire.  "If he had a knife to slash the tire, he's not going to throw it away after he slashes the tire."  Diaz told defendant that Rosa's husband was outside, and he needed someone to pick up Rosa.  Defendant testified that Diaz also told him on the phone "he's going to kill me, he's right outside my door."  He also claimed that Diaz had said on the phone: "he's crazy, he's out there, he's going to kill me." Defendant claimed that he was spurred to action by a final text from Diaz, which he claimed was the text which read: "Cousin, I need help ASAP, no joke."  Defendant asserted

that he was mainly concerned about the safety of Diaz's daughter.  He thought Ryan might have a weapon because "I don't think you're going to go to an apartment looking for your wife with no weapon...."

When he decided to go to Diaz's apartment building, defendant brought two knives with him.  He brought these knives because "it seemed like the right thing to do at the time."  One of the knives was his own, and the other knife was someone else's knife that he grabbed "on the way out the door" to go to Diaz's apartment building. Defendant admitted that he frequently carried a knife, and that he did so that "[i]f I had it and a situation occurred, I would probably use it if I had to."  The second knife he grabbed was a large, double bladed knife that was bigger than a dagger.  A woman gave him a ride over to Diaz's apartment building.  Although defendant did not deny that other people were outside Diaz's apartment building at the time of the stabbing, he refused to identify any of them.  Defendant denied that Vincent was with him that evening, and he denied that Diaz had spoken to Vincent on defendant's cell phone that evening.

When defendant arrived at Diaz's apartment building, he walked up to within a few feet of Ryan before he saw him. Defendant had never met Ryan, and he initially had no idea whether this man was Rosa's husband.  According to defendant, when Ryan saw defendant, he asked "do you know Eric?"  Defendant said "no."  Ryan then asked "do you know Rosa?"  Defendant again said "no."  At that point, defendant assumed that Ryan was Rosa's estranged husband and that Ryan was "very mad."  Ryan was standing sideways to defendant, and defendant could not see Ryan's right hand. Defendant reached into his pocket and unfolded his folding knife inside his pocket.  He kept his hand on the knife.  Defendant positioned himself so that he was between Ryan and the apartment building, and his back was to the apartment building.  He turned and faced Ryan, told Ryan "fucker, just leave," and "smirk[ed]."  Ryan refused to leave.  Defendant said "you need to immediately leave." Ryan was an "arm's length" from defendant.  Defendant continued to tell Ryan to leave, and Ryan continued to refuse to leave.

Ryan took a step toward defendant, which defendant took as a "challenge."  At some point, Ryan started to pull a knife out of his sweatshirt's front pocket.  Ryan "didn't have [the knife] all the way out.  He was still pulling it out."  Defendant could see "[a] couple inches" of the blade, "[e]nough to know that it's a knife."  When defendant was shown the large knife that Rosa had found, he did not claim that Ryan had possessed that knife.

6

Instead, he claimed that he never saw "the full knife." Defendant immediately pulled out his knife and "started stabbing him." "As soon as I seen the knife it just happened. There was no time to think." Defendant started by stabbing Ryan in chest. "Once I started stabbing him I just kept going, pretty much." All of the stabbing occurred within a 30-second period. Defendant paid no attention to what happened to the knife he had seen Ryan begin to remove from his pocket. Defendant thought: "It was either him or me." When he was done stabbing Ryan, defendant "turned and ran." The large second knife that defendant had in his pocket fell out of his pocket as he was running away. Defendant denied that this second knife was the one Rosa found.

Lopez, 2011 WL 3568553, at *1-3 (footnotes omitted).

### III

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); Rose v. Hodges, 423 U.S. 19, 21 (1975).

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Additionally, habeas relief is warranted only if the constitutional error at issue had a "substantial and injurious

7

effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001) (internal quotation marks omitted).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409. Moreover, in conducting its analysis, the federal court must presume the correctness of the state court's factual findings, and the petitioner bears the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating

state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Felkner v. Jackson, 131 S. Ct. 1305, 1307 (2011).

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence.  "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision."  Williams, 529 U.S. at 412.  "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

When applying these standards, the federal court should review the "last reasoned decision" by the state courts.  See Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the state's highest court, the court "looks through" to the last reasoned opinion.  See Ylst, 501 U.S. at 804.

With these principles in mind regarding the standard and scope of review on federal habeas, the Court addresses Petitioner's claims.

## IV

## A

Petitioner first contends that there was insufficient evidence to support the finding that the murder was the result of deliberation and premeditation.  He also argues that the trial court

**9**

erred in responding to jury questions regarding these concepts. After setting forth the relevant state law, the state appellate court denied this claim as follows:

> Here, the jury's verdict was supported by substantial evidence of "planning activity" and of a "manner of killing" that were highly indicative of a deliberate and premeditated murder.
>
> Defendant did not simply encounter Ryan and use a knife he just happened to have available on his person to kill him.  First, defendant deliberated for more than two hours before deciding to respond to Diaz's request for assistance.  Next, after finally deciding to respond, defendant arranged for a ride over to Diaz's apartment building and, even though he already had one knife on his person, took a second larger knife to aid in his encounter.  Then, almost immediately after coming upon Ryan, defendant unfolded his knife in his pocket so that it would be ready, and kept the knife in his hand and concealed from sight. With his knife at the ready, defendant positioned himself so that his back was protected by the apartment building before launching his attack on Ryan.  In addition, the jury could have reasonably concluded that defendant had also arranged that another man would be present to provide him with backup.  All of this evidence reflected that defendant had planned to stab Ryan and placed himself in the most advantageous position available before launching his attack.  The fact that defendant suffered no wounds other than a small cut on his hand strongly supported a conclusion that his attack took Ryan so unaware that he had no opportunity to defend himself.
>
> The manner in which defendant killed Ryan was also indicative of premeditation and deliberation.  A stab wound to the chest is likely to be fatal, but defendant did not content himself with simply stabbing Ryan once in the chest.  He continued to stab him in the back, both in the neck and the torso, vital areas of Ryan's body. Defendant also inflicted several slashes on Ryan's face, wounds which the jury could have reasonably inferred could not have been inflicted unless Ryan had already been rendered defenseless.  The sheer number of potentially fatal stab wounds reflected that defendant had made a deliberate decision to ensure that Ryan died.
>
> We reject defendant's challenge to the sufficiency of the evidence of premeditation and deliberation.

10

1   Lopez, 2011 WL 3568553, at *5-6.

2                                        1

3          The Due Process Clause "protects the accused against

4   conviction except upon proof beyond a reasonable doubt of every fact

5   necessary to constitute the crime with which he is charged." In re

6   Winship, 397 U.S. 358, 364 (1970).  A state prisoner who alleges

7   that the evidence in support of his state conviction cannot be

8   fairly characterized as sufficient to have led a rational trier of

9   fact to find guilt beyond a reasonable doubt therefore states a

10  constitutional claim, see Jackson v. Virginia, 443 U.S. 307, 321

11  (1979), which, if proven, entitles him to federal habeas relief, see

12  id. at 324.

13          The Supreme Court has emphasized that "Jackson claims face

14  a high bar in federal habeas proceedings . . . ." Coleman v.

15  Johnson, 132 S. Ct. 2060, 2062, 2064 (2012) (per curiam) (finding

16  that the Third Circuit "unduly impinged on the jury's role as

17  factfinder" and failed to apply the deferential standard of Jackson

18  when it engaged in "fine-grained factual parsing" to find that the

19  evidence was insufficient to support petitioner's conviction).  A

20  federal court reviewing collaterally a state court conviction does

21  not determine whether it is satisfied that the evidence established

22  guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338

23  (9th Cir. 1992).  The federal court "determines only whether, 'after

24  viewing the evidence in the light most favorable to the prosecution,

25  any rational trier of fact could have found the essential elements

26  of the crime beyond a reasonable doubt.'"  Payne, 982 F.2d at 338

27

28                                      11

1    (quoting <u>Jackson</u>, 443 U.S. at 319).  Only if no rational trier of

2    fact could have found proof of guilt beyond a reasonable doubt has

3    there been a due process violation.  <u>Jackson</u>, 443 U.S. at 324;

4    <u>Payne</u>, 982 F.2d at 338.

5           Petitioner has failed to demonstrate that the state

6    court's determination was an unreasonable application of Supreme

7    Court authority.  The state court correctly noted that there was an

8    abundance of evidence that Petitioner's killing of the victim was

9    deliberate and premeditated.  Petitioner waited two hours before

10   deciding to go to the scene to aid his cousin, he sought a friend to

11   drive him and brought another cousin, and he brought two knives with

12   him.  Petitioner stabbed the victim twenty times, and despite

13   inflicting a fatal stab wound to the victim's chest, Petitioner

14   continued to stab him.  Looking at all of this evidence, a rational

15   juror could have found that Petitioner's actions were deliberate and

16   premeditated.  Petitioner is not entitled to habeas relief on this

17   claim.

18                                    2

19           Petitioner also contends that the trial court's responses

20   to jury inquiries about premeditation and deliberation were

21   inadequate and erroneously described the two independent

22   requirements.  The state appellate court set forth the relevant

23   state law and denied this claim as follows:

24              1. Background
             At the end of the trial, the court instructed the jury
25           with CALCRIM No. 521 on what was required to prove first
             degree murder.  "If you decide the defendant committed
26           murder, you must decide whether it is murder in the first
             degree or murder in the second degree.  [¶]  The
27

28                                   12

defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately and with premeditation.  The defendant acted willfully if he intended to kill.  The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. [¶]  The defendant acted with premeditation if he decided to kill before commission of the act that caused death. [¶]  The length of time the person spends considering whether to kill does not alone determine whether the killing is deliberate or premeditated.  The time required for deliberation and premeditation may vary from person to person and according to the circumstance.  A decision to kill made rashly and impulsively without careful consideration is not deliberate and premeditated.  [¶] On the other hand, a cold, calculated decision to kill can be reached quickly.  The test is the extent of the reflection.  The length of time alone does not determine it.  [¶]  All other murders are second degree murders."

On the jury's second day of deliberations, the jury submitted the following inquiry: "521 Murder: Degrees clarification [¶] 1 Premeditation-do we need to determine & agree at what time the premeditation occurred? [¶] 2 Would you please clarify premeditation further, i.e. via an example OR if 'the test is of the extent of the reflection'-is 1 or 2 seconds adequate?"  "521" refers to CALCRIM No. 521, the jury instruction on first degree murder.  The judge responded in writing: "In answer to Question 1, you do not need to determine and agree at what time the premeditation occurred.  [¶]  With respect to Question 2, I am unable to give you an example or further clarify the extent of reflection required.  I would note that the third paragraph of Instruction 521 appears to answer your question."

On the jury's third day of deliberations, the jury submitted another inquiry to the judge. "1 Can a decision to kill be NOT pre-meditated? (besides in self defense or imperfect self defense)."  The next morning, the judge provided the jury with a lengthy written response which began: "Hopefully the following additional instructions will be helpful to you."  The trial court's "additional instructions" were: (1) CALJIC No. 8.11, which defines malice; (2) CALJIC No. 8.20, which defines first degree murder; and (3) CALJIC No. 8.30, an instruction that, where "the evidence is insufficient to prove deliberation and premeditation," a murder is "[m]urder of the second degree."  Later that day, the jury asked for a read back of defendant's testimony.  The jury returned its verdict the next day.

2. Analysis

. . .

The trial court's responses to the jury's inquiries did
not violate Penal Code section 1138.  The trial court
could have reasonably concluded that any direct response
to the jury's initial inquiry requesting "an example" and
asking "is 1 or 2 seconds adequate" would have improperly
invaded the jury's province.  The court properly referred
the jury back to CALCRIM No. 521, which directly
addressed this issue.  Even if that response was
inadequate, the court gave a much more detailed response
to the jury's second inquiry.  This time, having
apparently concluded that the jury was having difficulty
with the language of CALCRIM No. 521, the court decided
to supply the jury with the alternative language used in
CALJIC No. 8.20, in hopes that this language would
further illuminate the concept for the jury.  The fact
that the jury made no further inquiries reflects that the
court's detailed response to its second inquiry was
satisfactory.

Defendant claims that the court's response to the jury's
first inquiry should have been to "refer[ ] to the
requirement of deliberation and [tell the jury that] one
or two seconds is only adequate if deliberation is
shown."  We disagree.  First, our review is for abuse of
discretion.  The trial court was responding to an inquiry
regarding the time necessary for premeditation.  It could
have reasonably determined that a response focused on
deliberation would not be appropriate.  Instead, the
trial court reasonably concluded that the jury should be
referred back to the applicable jury instruction, CALCRIM
No. 521, which fully addressed this issue.

Defendant maintains that the court's response to the
jury's second inquiry should have been to tell the jury
that "a decision to kill may not be sufficient if
premeditation and deliberation are not shown."  Both
CALCRIM No. 521 and CALJIC No. 8.20 inform the jury that
a decision to kill is not sufficient and that both
premeditation and deliberation must be proved.  (CALCRIM
No. 521 ["A decision to kill made rashly, impulsively, or
without careful consideration is not deliberate and
premeditated"]; CALJIC No. 8.20 ["a mere unconsidered and
rash impulse, even though it includes an intent to kill,
is not deliberation and premeditation"].)  Since the
trial court's initial reference back to CALCRIM No. 521
in response to the jury's first inquiry and its
subsequent instruction to the jury with CALJIC No. 8.20
in response to the jury's second inquiry conveyed

14

precisely this concept, defendant's contention lacks substance.

Although defendant repeatedly complains without elaboration that these instructions "conflated and confused the separate concepts of premeditation and deliberation," he does not directly attack either CALCRIM No. 521 or CALJIC No. 8.20 and does not present any argument that either of these instructions is constitutionally deficient. Appellate courts may disregard assertions which are not supported by adequate argument but merely suggested in a brief. (People v. Gordon (1990) 50 Cal. 3d 1223, 1244 fn.3, overruled on another point in People v. Edwards (1991) 54 Cal. 3d 787, 835.)

The trial court did not abuse its discretion in responding to the jury's inquiries.

Lopez, 2011 WL 3568553, at *6-9 (footnote omitted).

"When a jury makes explicit its difficulties a trial judge should clear them away with concrete accuracy." Bollenbach v. United States, 326 U.S. 607, 612-13 (1946). The trial judge has a duty to respond to the jury's request for clarification with sufficient specificity to eliminate the jury's confusion. See Beardslee v. Woodford, 358 F.3d 560, 574-75 (9th Cir. 2004) (harmless due process violation occurred when, in responding to request for clarification, court refused to give clarification and informed jury that no clarifying instructions would be given).

But when a trial judge responds to a jury question by directing its attention to the precise paragraph of the constitutionally adequate instruction that answers its inquiry, and the jury asks no follow-up question, a reviewing court may "presume[] that the jury fully understood the judge's answer and appropriately applied the jury instructions." Waddington v. Sarausad, 555 U.S. 179, 196 (2009). After all, the trial judge has

15

wide discretion in charging the jury, a discretion which carries over to the judge's response to a question from the jury.  <u>Arizona v. Johnson</u>, 351 F.3d 988, 994 (9th Cir. 2003).  And just as a jury is presumed to follow its instructions, it is presumed to understand a judge's answer to a question.  <u>Weeks v. Angelone</u>, 528 U.S. 225, 234 (2000).

        Petitioner has failed to show that the denial of this claim was unreasonable.  The appellate court noted that in answering the first question, the trial court directed the jury to the appropriate language in the jury instructions, but did not proceed further as to not interfere with the jury's fact finding function. When the jury asked a second question regarding the same issue, the trial court provided further more detailed instructions.  The jury returned a verdict the following day without any more questions. The California Court of Appeal concluded that the jury understood the instructions and appropriately followed them, therefore finding that Petitioner was not entitled to relief.  <u>See</u> <u>Waddington</u> at 196. Petitioner has failed to assert specific arguments concerning how the trial court's actions were improper or how the appellate court's decision was an unreasonable application of federal law.  He concludes the jury was confused regarding premeditation and deliberation but his conclusory arguments are insufficient to warrant habeas relief.  This claim is denied.

                                    B

        Petitioner contends that the trial court erred by admitting evidence of his violent character.  The state appellate

16

1    court set forth the background for this claim as follows:

2            In its trial brief, the prosecution noted that it
             intended to impeach defendant with evidence that he had
3            committed an aggravated assault (Pen.Code, § 245, subd.
             (a)), dissuaded a witness (Pen.Code, § 136.1), and
4            committed arson (Pen.Code, § 451, subd. (d)).  The
             prosecution also pointed out that, if defendant
5            introduced character evidence regarding [the victim's]
             propensity for violence, the prosecution should be
6            permitted to introduce such evidence as to defendant
             under Evidence Code section 1103.  The evidence that the
7            prosecution sought to introduce was the same conduct that
             it sought to impeach defendant with: the assault,
8            dissuasion, and arson.

9    Lopez, 2011 WL 3568553, at *9 (footnote omitted).

10           Petitioner's trial counsel elicited evidence of the

11   victim's, Ryan's, violent behavior, when he cross-examined Ryan's

12   wife.  Lopez, 2011 WL 3568553, at *10.  As a result of the evidence

13   of Ryan's violent behavior, the trial court found that the

14   prosecution could introduce evidence of Petitioner's violent

15   character under California Evidence Code section 1103.  Id. at 9-10.

16   The trial court issued a limiting instruction regarding the

17   character evidence, and the evidence was heard regarding violent

18   incidents Petitioner engaged in.  Id. at 11-12.  The California

19   Court of Appeal considered Petitioner's arguments and denied this

20   claim:

21           The defense went to great lengths to introduce evidence
             of Ryan's [the victim's] prior violence.  Its
22           cross-examination of Rosa on this subject was very
             detailed and extensive, and other witnesses were
23           questioned by the defense about their knowledge of Ryan's
             violence.  In this context, the trial court would not
24           have abused its discretion in overruling a defense
             objection to the prosecution introducing the "details" of
25           defendant's May 2007 and March 2008 acts of violence.
             Under Evidence Code section 1103, the prosecution was
26           entitled to utilize evidence of the details of
             defendant's prior acts of violence to counter the

27

28                                    17

defense's introduction of the details of Ryan's prior acts of violence.

Defendant also claims that the court's allegedly erroneous admission of these "details" was exacerbated by the court's ruling excluding evidence that defendant had not been charged with assault for the May 2007 incident. Defendant was actually charged with witness dissuasion and arson for the May 2007 incident, but it is difficult to imagine a relevant basis for the prosecution to introduce evidence that those charges had been brought or that the assault victim was uncooperative to counter evidence that no assault charge had been brought. Defendant asserts, without explanation, that "[t]he prosecution was free to offer reasons for non-prosecution." It is not a sound argument that irrelevant defense evidence could have been rebutted with irrelevant prosecution evidence. The issue here was not whether defendant's acts were criminal but whether they were violent. The jury was explicitly instructed that the evidence regarding the May 2007 incident was admitted for the sole purpose of demonstrating that defendant had committed prior acts of violence to show his character for violence. The fact that an assault charge had not been brought against him for that incident had no relevance to whether he had engaged in a violent act on that occasion. Furthermore, defendant did not deny engaging in the acts of violence involved in the May 2007 incident. He freely admitted that he had repeatedly stabbed a man on that occasion after having disarmed the man. The trial court did not err in excluding irrelevant evidence that defendant was not charged with assault for the May 2007 incident.

Defendant also claims that, regardless of the propriety of the trial court's rulings, the admission of the Evidence Code section 1103 evidence violated his right to due process. His argument fails to explain exactly how it was that this evidence violated his right to due process other than to state repeatedly that it created "gross unfairness." We find no basis in the record for this assertion. Evidence of defendant's character for violence was admissible at trial only because defendant introduced evidence of Ryan's character for violence. It was a reasonable tactical choice for defendant's trial counsel to make, but the result was that evidence of defendant's violent acts was admissible at trial. This was not unfair, and certainly not "gross unfairness." The counterbalance required by Evidence Code section 1103 is the essence of fairness, as it allows the defense, and only the defense, to make a decision about whether evidence of a character trait for violence will be

18

admitted at trial.  Defendant was not deprived of due process.

<u>Lopez</u>, 2011 WL 3568553, at *13-14 (footnote omitted).

A state court's procedural or evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process.  <u>See</u> <u>Pulley v. Harris</u>, 465 U.S. 37, 41 (1984); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919-20 (9th Cir. 1991).  Accordingly, a federal court cannot disturb on due process grounds a state court's decision to admit evidence of prior crimes or bad acts unless the admission of the evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  <u>See</u> <u>Walters v. Maass</u>, 45 F.3d 1355, 1357 (9th Cir. 1995); <u>Colley v. Sumner</u>, 784 F.2d 984, 990 (9th Cir. 1986).

The United States Supreme Court has left open the question of whether admission of propensity evidence violates due process. <u>Estelle v. McGuire</u>, 502 U.S. 62, 75 n.5 (1991).  Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of  prior crimes to show propensity for criminal activity is not clearly established under 28 U.S.C. § 2254(d) and therefore cannot form the basis for federal habeas relief.  <u>See</u> <u>Larson v. Palmateer</u>, 515 F.3d 1057, 1066 (9th Cir. 2008) (because Supreme Court expressly reserved question of whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of

19

claim did not unreasonably apply clearly established federal law).

To the extent that Petitioner is arguing that the state courts erroneously applied or interpreted state law with respect to the admission of the evidence, no federal habeas relief is available.  The Supreme Court has repeatedly held that a federal habeas writ is unavailable for violations of state law or for alleged error in the interpretation or application of state law. See Swarthout v. Cooke, 562 U.S. 216, 222 (2011).  Nor is there any established Supreme Court authority that the admission of irrelevant or overtly prejudicial evidence can justify habeas relief.  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).

Petitioner has also failed to demonstrate that the admission of this evidence was arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  As discussed by the California Court of Appeal, the jury was properly instructed on how to review the evidence and there was overwhelming evidence against Petitioner.  Petitioner has failed to show that the admission of the evidence rendered the trial fundamentally unfair.  The claim is denied.

C

Petitioner next argues that the prosecutor committed misconduct during opening and closing arguments by making misleading comments about Petitioner's failure to call a witness, making a statement that Petitioner carved the face of a victim in a prior assault case similar to the victim in this case, and stating that there was an arrest warrant for Petitioner for a prior crime.

20

Prosecutorial misconduct is cognizable in federal habeas corpus. The appropriate standard of review is the narrow one of due process and not the broad exercise of supervisory power. <u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986). A defendant's due process rights are violated when a prosecutor's misconduct renders a trial "fundamentally unfair." <u>Id.</u>; <u>Smith v. Phillips</u>, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor"). Under <u>Darden</u>, the first issue is whether the prosecutor's remarks were improper; if so, the next question is whether such conduct infected the trial with unfairness. <u>Tan v. Runnels</u>, 413 F.3d 1101, 1112 (9th Cir. 2005); <u>see also Deck v. Jenkins</u>, 768 F.3d 1015, 1023 (9th Cir. 2014) (recognizing that <u>Darden</u> is the clearly established federal law regarding a prosecutor's improper comments for AEDPA review purposes). A prosecutorial misconduct claim is decided "'on the merits, examining the entire proceedings to determine whether the prosecutor's remarks so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" <u>Johnson v. Sublett</u>, 63 F.3d 926, 929 (9th Cir. 1995); <u>see Trillo v. Biter</u>, 769 F.3d 995, 1001 (9th Cir. 2014) ("Our aim is not to punish society for the misdeeds of the prosecutor; rather, our goal is to ensure that the petitioner received a fair trial.").

1

Petitioner contends that the prosecutor committed misconduct by noting that Vincent Lopez, who was allegedly with

Petitioner during the incident, was not called as a defense witness, when Vincent[2] had in fact invoked his Fifth Amendment rights. Vincent invoked his Fifth Amendment rights and was found to be unavailable.  Reporter's Transcript ("RT") at 1072.  The prosecutor introduced Vincent's preliminary hearing testimony where he stated that he had no contact with Diaz or Petitioner on the night of the incident and he denied using Petitioner's phone that night.  RT at 1074-79.  Vincent stated that he never left his home that night. Id.

        During opening statements the prosecutor stated:

> "Why have other people, why were other people coming in here and lying for the defendant? ... [¶] Vincent Lopez, I'm sure many of you believe Vincent was involved in this.  If this was self-defense, Vince didn't think it was, because if you believe—Vincent Lopez was there.  You heard his testimony, he wasn't there.  He didn't see it, he didn't get any phone calls, he doesn't know what we're talking about. [¶] ...  It's not self-defense.  There's no blood and there's no blood trail, no fight.  The bushes aren't broken. There's no injury to [defendant] or Vincent Lopez, there is no struggling, ladies and gentlemen; this was a vicious attack that came out of nowhere.  It was quick, it was violent, it was determined. It was premeditated. [¶] This again.  You know what?  If there were any, any shred of believability in the defendant's version, you know what, those people, he would have brought somebody in.  Because, you know what?  As I talked about before, it's not snitching on somebody if you didn't do anything wrong.  It's not snitching on anybody if, as by his version, they weren't involved."  "He's lying about being the only person there. He's lying about being the only person who attacked Ryan Townes."

Lopez, 2011 WL 3568553, at *15.

        Petitioner's trial counsel later objected and requested a mistrial, but the trial court denied the motion.  Id.  Trial counsel

---

[2] The Court will refer to Vincent Lopez by his first name because he shares the same last name as Petitioner.

then argued to the jury that Vincent's failure to come forward was
due to fear for his own safety.  Id. at 16.  The prosecutor then
argued in closing statements:

> "When we're talking about Vincent Lopez, he is exactly as the
> court instructed you, he's unavailable.  You're not to
> speculate on why he's not here; he might be out of the city,
> state or country.  It's irrelevant because what we've got it
> is Vince's testimony that he swore to under oath at a prior
> hearing.  That's what Vincent Lopez said.  So when the defense
> says there's no evidence of what Vincent Lopez thought, that's
> not true.  It's just not there. [¶]  And when I talked about,
> you know what, bring in those other people, what [defendant]
> said not on that stand was, well, there were people at the
> party that I left at the guy's apartment.  Where is the guy
> who he took the knife from to come in and say, no, the knife
> that he took from me was, it had that snake and gold embossed
> handle, or better yet, that it didn't look like this knife,
> [the one found at the scene].  Where is that person?  Where is
> the person who can say, I drove [defendant] over there on Park
> Avenue at this time.  As he was going, he may have said
> something about why he was going there.  Where is that person
> to corroborate his story?  The defendant also said, you know
> what, there was a guy there and another woman.  Where is that
> person?  Where is that other woman who was there?"

Lopez, 2011 WL 3568553, at *16.

The California Court of Appeal denied this claim:

> Defendant contends that the prosecutor's comments about
> Vincent "were misleading and took unfair advantage of the
> court's ruling ... that he was unavailable."  He argues that
> the prosecutor's arguments suggested that defendant should
> have called Vincent to testify, when he could not.  Defendant
> also claims that the prosecutor's comment, "[i]f this was
> self-defense, Vince didn't think it was," was improper because
> there was no evidence to support it.
>
> The prosecutor's remarks about Vincent in his opening argument
> did not suggest that defendant was remiss in not bringing
> Vincent in to testify on his behalf.  Instead, the prosecutor
> characterized Vincent as one of the people who were "coming in
> here and lying for the defendant."  Thus, the prosecutor
> acknowledged that Vincent had testified, and he asked the jury
> to conclude that Vincent was lying.  The prosecutor argued
> that, if the jury concluded that Vincent was lying about not
> being present, Vincent was doing so because he knew that
> defendant had not acted in self-defense.  These were
> reasonable inferences to draw from the evidence.  Diaz

23

testified that he spoke to Vincent on defendant's cell phone that evening and that both defendant and Vincent said they were coming over.  Rosa saw one man standing behind Ryan while another man was stabbing Ryan.  A reasonable juror could have concluded from this evidence that Vincent was the man standing behind Ryan and that, if Vincent had been there and seen defendant act in self-defense, he would have told the truth in his testimony to help his nephew rather than denying his presence.  While there were certainly other reasonable inferences which could have been drawn from this evidence, as defendant's trial counsel argued in his closing argument, the prosecutor's remarks about Vincent in his opening argument were a fair comment on the evidence and did not constitute misconduct.  (<u>People v. Williams</u>, <u>supra</u>, 16 Cal. 4th at p. 221.)

The prosecutor's remarks about Vincent in his closing argument were also not misconduct.  The prosecutor accurately pointed out that Vincent's prior testimony was before the jury and that Vincent was unavailable to testify at trial. He went on to identify a number of people, a list that did not include Vincent, who defendant could have called to testify in support of his self-defense claim.

We find no prosecutorial misconduct in the prosecutor's remarks about Vincent.

<u>Lopez</u>, 2011 WL 3568553, at *17.

        The state appellate court's decision was not an unreasonable application of Supreme Court authority.  The prosecutor's comments were not improper or misleading.  While Vincent did not testify, his testimony from the preliminary hearing was admitted and the prosecutor was able to comment on the testimony and note that other witnesses, such as the victim's wife and Diaz, observed additional people at the scene.[3]

        A prosecutor may properly comment upon a defendant's failure to present witnesses so long as it is not phrased to call

_____

        [3] After Diaz testified at trial that he did not see who attacked the victim, the prosecutor noted that he had told police that Petitioner and Vincent had committed the offense.  RT at 458-59.

attention to defendant's own failure to testify.  See United States v. Castillo, 866 F.2d 1071, 1083 (9th Cir. 1988).  Here, Petitioner testified in his own defense, and it was not improper for the Prosecutor to call doubt on the testimony in relation to the other evidence.  Even assuming that the prosecutor's remarks were improper, they did not infect the trial with unfairness.  There was overwhelming evidence of Petitioner's guilt and little to support Petitioner's claim of self-defense.  This claim is denied.

                                    2

        Petitioner argues that the prosecutor committed misconduct by arguing that Petitioner "carved" the face of the victim, Ryan, and, in a prior incident, the face of another individual.  The prosecutor introduced several prior violent acts by Petitioner to rebut the evidence of the victim's violent character.  A correctional officer testified regarding a fight while Petitioner was in custody involving Petitioner and several other inmates against another inmate, where Petitioner punched and kicked the other inmate who was on the ground.  The inmate suffered numerous injuries, including a cut near his ear.  RT at 586-93.  The trial court denied trial counsel's objections and ruled that the prosecutor could argue the similarities between the cut on Ryan's face in the instant case and the cut on the inmate in the prior incident.  RT at 605-14.  The prosecutor and trial counsel made the following arguments to the jury:

> In his opening argument, the prosecutor argued to the jury that the stab wounds defendant inflicted during the May 2007 incident were "very similar" to the stab wounds to Ryan, which, in his view, did not suggest that defendant was acting

out of fear, but instead deliberately trying to kill these
men.  He also urged the jury to compare the cut on Ryan's face
to the cut on [the inmate's] face, which he characterized as
"similar."  "[T]his isn't self-defense.  The defendant *signed
his work*.  That is not a wound that happens in the heat of a
battle; that is not a wound that happens during a sudden
quarrel; that is not a wound that takes place under the
immediate fear in the necessity to act.  What that is is a
carving on somebody's face. It's a perfectly straight line.
[¶] Now, [the inmate] was still alive and struggling.  But
after the defendant got done stabbing Ryan Townes, *he signed
it*."  (Italics added.)  "I want you to think, well, when did
[defendant] have time, under this anxiety and fear and
reacting, to *sign his work*? " (Italics added.)  Defendant's
trial counsel interposed no objection to this argument.

The defense argued that "there's no evidence whatsoever that a
cutting instrument was actually used on [the inmate].  If you
look at that mark, it could very well have been a scratch that
occurred, you cannot tell."  He argued that the marks were "a
coincidental occurrence."  "It is not something that was
specifically done."  "[T]hat is not a mark that was purposely
placed there.  There wasn't time to do it, it doesn't fit with
the surrounding circumstances, it doesn't fit with him running
away and all the rest of it.... It's a coincidence...."

The prosecutor responded in his closing argument: "Again,
that's that mark again I was showing you about Ryan Townes.
That's calm, that's cool, that's collected.  Again, the mark
on [the inmate] ... that's calm, that's cool, that's
collected, that's planned, that's predetermined, that's
deliberate."

Lopez, 2011 WL 3568553, at *18.

The California Court of Appeal denied this claim:

Defendant contends on appeal that the prosecutor's argument
regarding the similarities between [the inmate's] facial wound
and Ryan's facial wound was misconduct because it (1) was
"false and misleading," (2) utilized the evidence for a
purpose "outside the purposes for which it is properly
admissible," and (3) lacked any evidentiary basis because
there was no evidence that defendant had inflicted the cut on
[the inmate's] face.

We find no merit in defendant's claim that the prosecutor's
argument that the two cuts were similar was "false."  The
defense essentially conceded that the two cuts were similar,
and the jury had before it photographs of the facial wounds to
[the inmate] and Ryan.  Nor do we credit his claim that the
prosecutor's argument utilized the Evidence Code section 1103

26

evidence for an impermissible purpose.  Evidence Code section 1103 evidence may properly be used to show a defendant's character for violence.  Defendant's violent infliction of a facial wound on [the inmate] demonstrated his ferocity toward a defenseless victim, and it tended to show that he acted in a similarly fierce manner when he inflicted a similar wound on Ryan when Ryan was defenseless.  Character evidence is properly used to show that a person acted in conformance with that character trait.  Evidence of the similar facial wounds did so here.

Defendant's primary claim is that the prosecutor's argument lacked any evidentiary basis because there was no evidence that defendant was the person who inflicted [the inmate's] facial wound.  It is true that there was no direct evidence that defendant inflicted that wound or utilized a weapon during the attack on Alfaro.  However, the prosecutor was not precluded from arguing based on reasonable inferences from the evidence.  Defendant was the initiator of the assault on [the inmate]. [A correctional officer] testified that defendant and Ledesma were the primary attackers, and Candelaria joined them.  Defendant denied that anyone other than Candelaria was involved. [The inmate's] injuries were primarily to his face, and defendant was seen both punching and kicking him.  The jury could have reasonably concluded from this evidence that defendant was the source of the wound to [the inmate's] face. While no one saw defendant in possession of a cutting instrument and no such instrument was recovered, the jury, which had before it a photograph of [the inmate's] wound, could have concluded that this wound could have been inflicted only by a cutting instrument of some kind.  The jury was not compelled to accept the defense argument that the wound was merely a "scratch."  While the evidence on this point was weak, the prosecutor must be permitted "'"wide latitude"'" to argue reasonable inferences from the evidence.  (People v. Williams, supra, 16 Cal.4th at p. 221.)

Lopez, 2011 WL 3568553, at *19.

        The California Court of Appeal's denial of this claim was not an unreasonable application of Supreme Court authority.  The prosecutor argued that the two wounds were similar and this was a reasonable inference based on the evidence.  Prosecutors are allowed reasonably wide latitude in closing arguments.  See United States v. Henderson, 241 F.3d 638, 652 (9th Cir. 2000), as amended (2001) (during closing argument "[p]rosecutors have considerable leeway to

strike 'hard blows' based on the evidence and all reasonable inferences from the evidence").  Even if this was misconduct, Petitioner has failed to demonstrate that it resulted in a denial of due process.  It is undisputed that Petitioner killed the victim. The evidence also demonstrated that Petitioner brought two knives, stabbed the victim twenty times, and despite inflicting a fatal stab wound to the victim's chest continued to stab him.  Petitioner is not entitled to relief for this claim.

3

Petitioner also contends that the prosecutor committed misconduct by erroneously referencing a 2007 arrest warrant in closing arguments when no such warrant existed.  The state appellate court described the relevant background and denied this claim:

> The prosecutor argued to the jury in his opening argument that defendant's statements at the time of his arrest demonstrated consciousness of guilt.  "The defense asked several of the officers, well, did you know that he had a warrant out for his arrest for, you know, *that assault* that had taken place in May, and the defendant said, well, I wasn't sure they'd pick me up for this right away."  (Italics added.)  Defendant's trial counsel immediately objected: "Your honor, object. Misstates the evidence, assault in May, a warrant for the assault in May."  The court admonished the jury: "Ladies and gentlemen, you're the judges of the facts in this case. You've heard all of the evidence.  If the attorneys are at all inaccurate in their arguments as to what you understand the evidence to be, it's your understanding that's important. I'll allow counsel to continue, but keep in mind that what counsel says is not evidence; you will determine the evidence based upon the testimony you received."  The prosecutor immediately corrected himself: "The defense asked several witnesses several questions that they knew about *the occurrence* that had taken place in May. Whether or not Mr. Lopez was wanted for that."  (Italics added.)  The defense argued to the jury "there's no evidence at all that [defendant] was charged with anything regarding that [May 2007] assault.  The D.A. didn't present evidence to that effect at all."  "That's self-defense.  He wasn't charged with that; there's no evidence of it."

28

> The prosecutor unquestionably misspoke when he referred to an "assault" charge for the May 2007 incident. However, the prosecutor's mistake was readily corrected by the court's admonition followed by the prosecutor's correction. In addition, the defense pointed out in its argument that no assault charge had been brought, and the prosecutor did not claim otherwise. We can see no potential for prejudice from the prosecutor's brief, immediately corrected, mistaken reference to a nonexistent assault charge arising from the May 2007 incident.

Lopez, 2011 WL 3568553, at *20 (footnote omitted).

While the prosecutor did misstate the facts, the trial court immediately admonished the jury and the prosecutor corrected himself. Petitioner has failed to demonstrate how this isolated error violated his due process and that the state court's denial of this claim was unreasonable. See, e.g., Donnelly v. DeChristoforo, 416 U.S. 637, 645 (1974) (holding that the prosecutor did not violate the petitioner's constitutional rights where misconduct "was but one moment in an extended trial and was followed by specific disapproving instructions"). In light of the evidence presented against Petitioner, this minor misstatement that was immediately corrected does not entitle him to habeas relief.

D

Petitioner contends that the trial court erred in issuing the following jury instructions regarding: 1) imperfect self-defense; 2) provocation and contrived self-defense; 3) unjoined perpetrators; 4) voluntary intoxication; and 5) accomplice liability.

A challenge to a jury instruction solely as an error under state law does not state a claim cognizable in federal habeas corpus proceedings. See Estelle, 502 U.S. 62, 71-72. See, e.g., Stanton

29

v. Benzler, 146 F.3d 726, 728 (9th Cir. 1998) (state law determination that arsenic trioxide is a poison as a matter of law, not element of crime for jury determination, not open to challenge on federal habeas review).  Nor does the fact that a jury instruction was inadequate by Ninth Circuit direct appeal standards mean that a petitioner who relies on such an inadequacy will be entitled to habeas corpus relief from a state court conviction.  See Duckett v. Godinez, 67 F.3d 734, 744 (9th Cir. 1995) (citing Estelle, 502 U.S. at 71-72).

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See Estelle, 502 U.S. at 72; Cupp v. Naughten, 414 U.S. 141, 147 (1973); see also Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974) (quoting Cupp, 414 U.S. at 146) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some [constitutional] right...'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See Estelle, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  United States v. Frady, 456 U.S. 152, 169 (1982) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977)); see, e.g., Middleton v. McNeil, 541 U.S. 433, 434-35 (2004) (per curiam) (no reasonable likelihood that jury misled by single contrary

30

instruction on imperfect self-defense defining "imminent peril"
where three other instructions correctly stated the law).

                                    1

          Petitioner contends that the trial court erred in the
imperfect self-defense instruction because it repeatedly stated
"subjective reasonableness" rather than "subjective belief".

          The following occurred at trial:

> The court instructed the jury on both self-defense and
> imperfect self-defense.  It gave complete instructions on
> both.  The imperfect self-defense instructions told the jury:
> "A killing that would otherwise be murder is reduced to
> voluntary manslaughter if the defendant killed a person
> because he acted in imperfect self-defense or imperfect
> defense of another. [¶] If you conclude the defendant acted
> with complete self-defense or defense of another, his action
> was lawful and you must find him not guilty of anything. [¶]
> The difference between complete self-defense or defense of
> another and imperfect self-defense or imperfect defense of
> another depends on whether the defendant's belief in the need
> to [use] deadly force was reasonable. [¶] The defendant acted
> in imperfect self-defense or imperfect defense of another if:
> [¶] One, the defendant actually believed that he or someone
> else was in imminent danger of being killed or suffering great
> bodily injury; [¶] And two, the defendant actually believed
> that the immediate use of deadly force was necessary to defend
> against the danger; [¶] But three, *at least one of those
> beliefs was unreasonable*. [¶] Belief in future harm is not
> sufficient, no matter how great or likely the harm is believed
> to be .[¶] ... [¶] The People have the burden of proving
> beyond a reasonable doubt that the defendant was not acting in
> imperfect self-defense or imperfect defense of another. [¶] If
> the People have not met that burden, you must find the
> defendant not guilty of murder. [¶] The difference between
> self-defense and imperfect self-defense is as follows: [¶]
> Self-defense requires both *subjective reasonableness* and
> objective reasonableness. [¶] Self-defense completely
> exonerates the accused.  Imperfect self-defense requires only
> *subjective reasonableness*.  *Subjective reasonableness* negates
> malice aforethought, thus reducing homicide to voluntary
> manslaughter." (Italics added.)

Lopez, 2011 WL 3568553, at *20.

The California Court of Appeal denied this claim:

> The final three sentences of the court's imperfect
> self-defense instructions contained an error.  These sentences
> erroneously substituted the phrase "subjective reasonableness"
> for the phrase "subjective belief."  The words "subjective
> reasonableness" were never defined for the jury.  This portion
> of the instruction conflicted with the remainder of the
> instruction which unequivocally instructed the jury that
> imperfect self-defense applied when the defendant had the
> requisite beliefs in the imminency of the danger and the need
> to use force but one or both of those beliefs was
> unreasonable.  Because the court's imperfect self-defense
> instructions correctly informed the jury of the elements of
> imperfect self-defense but then used incorrect words to
> distinguish imperfect self-defense from perfect self-defense,
> the court's instructions were potentially ambiguous.

> "When reviewing ambiguous instructions, we inquire whether the
> jury was 'reasonably likely' to have construed them in a
> manner that violated the defendant's rights." (People v.
> Whisenhunt (2008) 44 Cal. 4th 174, 214.)  We do not believe
> that the jury was reasonably likely to misconstrue the meaning
> of the imperfect self-defense instructions due to the court's
> mistaken use of the words "subjective reasonableness" instead
> of "subjective belief" in describing the difference between
> self-defense and imperfect self-defense.  The imperfect
> self-defense instructions clearly stated that one of the
> elements of imperfect self-defense was that one of defendant's
> beliefs was "unreasonable."  These instructions also stated
> that the difference between self-defense and imperfect
> self-defense "depends on whether the defendant's belief ...
> was reasonable."  Under these circumstances, it was highly
> unlikely that the jury would have disregarded the correct
> instructions and determined that the court's use of the phrase
> "subjective reasonableness" meant that imperfect self-defense
> did not apply unless defendant's beliefs were reasonable,
> which would have made imperfect self-defense indistinguishable
> from perfect self-defense.

> Defendant argues that the impact on the jury of the trial
> court's mistaken use of the phrase "subjective reasonableness"
> was exacerbated by the prosecutor's arguments to the jury.

> In his opening argument, the prosecutor argued to the jury:
> "Imperfect self-defense.  There's a subtle difference.  Here,
> we are talking about, well, not what was objectively thought
> of under the situation, but did the defendant believe that his
> actions were necessary? [¶] And again, I would say that the
> defendant did not believe that there was imminent peril.  He
> still has to believe that, even if the killing occurred in a
> sudden quarrel or in the heat of passion, or the actual, but

32

unreasonable belief in the necessity to defendant [sic] oneself or others against imminent peril or GBI, great bodily injury, again, does the defendant actually believe that? Not what other people observed at the scene, but would he believe that he needed to do that? ... [¶] ... [¶] Now we're trying to delve into the defendant's head."  "In both perfect self-defense and imperfect self-defense, the defendant must subjectively, actually believe in the necessity to defend against imminent peril."  "Again, malice is negated in both self-defense and imperfect self-defense only if the defendant honestly believes the degree of force was in fact necessary." Nothing in the prosecutor's opening argument suggested that imperfect self-defense required that defendant's beliefs be reasonable.  The defense closing argument was also consistent with the trial court's correct instructions on the elements of imperfect self-defense: "With respect to imperfect self-defense, if one of your beliefs was unreasonable, ... you can have imperfect self-defense." If defendant had "an unreasonable belief ... [i]t's called an imperfect self-defense. Unreasonable on one of the points, that creates the self-defense. [¶] So I think this is a self-defense case, pure and simple.... But if you decide, I just can't go with that with the knife thing, that's an unreasonable belief on his part, you still can find that that's imperfect self-defense and you have to find him not guilty of murder, but rather guilty of voluntary manslaughter."

Defendant relies on a few of the prosecutor's remarks in his closing argument. The prosecutor argued in his closing argument that, while "you can keep attacking until the danger is over," "you can't keep stabbing until the person is dead, you can't stab this individual over and over again because that's the way you think or that's your mindset. *Not only for self-defense does it have to be reasonable objectively and subjectively.  Even in imperfect self-defense.  We can talk about what he was thinking, but it still have [sic] to be reasonable.  He has to believe what he's doing is reasonable. And he didn't.*" (Italics added.) "You know what, even in imperfect self-defense, his belief, *it has to be his subjective belief, but at some point he has to reasonably, in his mind it has to be an honest belief in his mind that person needs to die immediately in order to justify his fears and his actions*, and we don't have that. We just don't have that. [¶] Again, you have to believe that the defendant thought he was in danger."  "This is not an [sic] case of imperfect self-defense, because even the defendant didn't believe that that's what happened."

It is true that this portion of the prosecutor's argument strayed into ambiguity about whether reasonableness played a role in imperfect self-defense.  The prosecutor argued that imperfect self-defense required that the defendant "believe

what he's doing is reasonable." This is not an element of imperfect self-defense. However, we do not think it is likely that the jury would have been misled by these brief comments in light of the trial court's explicit instructions that an element of imperfect self-defense is that one or both of defendant's beliefs were unreasonable. Defendant did not object to this argument by the prosecutor, and he does not assign it as misconduct on appeal. Although defendant argues otherwise, it is well accepted that the applicable prejudice standard for an error in instructions on imperfect self-defense is the standard described in People v. Watson (1956) 46 Cal. 2d 818. (People v. Blakeley (2000) 23 Cal. 4th 82, 93.) "A conviction of the charged offense may be reversed in consequence of this form of error only if, 'after an examination of the entire cause, including the evidence' (Cal. Const., art. VI, § 13), it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred (Watson, supra, 46 Cal.2d 818, 836)." (People v. Breverman (1998) 19 Cal. 4th 142, 178.)

The prosecutor's brief remarks in his closing argument suggested only that defendant had to believe that he was acting reasonably in order to meet the elements of imperfect self-defense. This was not really inconsistent with the correct instructions on imperfect self-defense. Imperfect self-defense depends on a defendant actually and honestly believing that an imminent danger necessitates the use of deadly force. While the prosecutor's use of the word "reasonable" was not a good choice in this context, it is not reasonably probable that the jury would have understood the prosecutor's wording to refer to anything other than the requirement that the defendant believe that his use of force was necessary. A layperson would understand that a person who believes that their action is necessitated by an imminent danger would also believe that their action was reasonable.

The jury was given complete and correct instructions on the elements of imperfect self-defense as set forth in CALCRIM No. 571, and the prosecutor's opening argument and the defense closing argument were completely consistent with those correct instructions. Under these circumstances, the jury was not reasonably likely to be misled by the trial court's use of an inaccurate phrase in three sentences of the paragraph it added to the CALCRIM No. 571 instructions or by the prosecutor's poorly worded remarks in his closing argument.

Lopez, 2011 WL 3568553, at *21-23 (footnote omitted).

        In reviewing an ambiguous instruction, the inquiry is not

how reasonable jurors could or would have understood the instruction

as a whole; rather, the court must inquire whether there is a "reasonable likelihood" that the jury applied the challenged instruction in a way that violated the Constitution.  See Estelle, at 72 & n.4; Boyde v. California, 494 U.S. 370, 380 (1990); Ficklin v. Hatcher, 177 F.3d 1147, 1150-51 (9th Cir. 1999) (harmless error when certain that jury did not rely on constitutionally infirm instruction).  In order to show a due process violation, the petitioner must show both ambiguity and a "reasonable likelihood" that the jury applied the instruction in a way that violates the Constitution, such as relieving the state of its burden of proving every element beyond a reasonable doubt.  Waddington v. Sarausad, 555 U.S. 179, 190-191 (2009).

A determination that there is a reasonable likelihood that the jury applied the challenged instruction in a way that violated the Constitution establishes only that an error occurred.  See Calderon v. Coleman, 525 U.S. 141, 146 (1998).  If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, see Brecht v. Abrahamson, 507 U.S. 619, 637 (1993), before granting relief in habeas proceedings.  See Calderon, 525 U.S. at 146-47.

In this case the trial court correctly stated the elements of imperfect self-defense earlier in the disputed instruction.  The prosecutor also provided the correct instruction in his opening argument, as did Petitioner's trial counsel in his closing argument. The correct printed jury instruction was provided to the jury in the complete set of instructions.  CT at 415.  The California Court of

35

Appeal found that under these circumstances and because the inaccurate phrases were just in three sentences of the oral instruction, the jury was not reasonably likely to have been misled and to have applied the instruction in a way that violated the Constitution.  The state court similarly found that the prosecutor's remarks later in his closing argument did not confuse the jury.  The state court's decision was not unreasonable.

After reviewing the trial court records it is clear there was not a reasonable likelihood that the jury applied the challenged instruction in a way that violated the Constitution, especially as the correct passage was repeatedly stated to the jury and present in the printed instructions.  Even if the jury misapplied the instruction, Petitioner has not shown that the error had a substantial and injurious effect or influence in determining the jury's verdict.

## 2

Petitioner also contends that the trial court erred in instructing the jury on provocation and contrived self-defense because the instruction was not supported by the evidence and it is overbroad.  The California Court of Appeal described the background for this claim and denied relief:

> Defendant contends that the trial court erred in instructing the jury: "A person does not have the right of self-defense if he or she provokes a fight or quarrel with the intent to create an excuse to use force."
>
> He claims that the court should not have given this instruction because there was no evidentiary basis for it. The evidence before the jury was sufficient to support the court's instruction.  Diaz testified that he sought defendant's help solely to extricate Rosa from Diaz's

apartment.  Defendant did nothing to accomplish that goal.  He armed himself with two knives and arrived at the apartment building without his own means of transport.  After encountering Ryan, who did nothing more than ask defendant if he knew Diaz or Rosa, defendant immediately prepared to use his knife by unfolding it and keeping his hand on it but also keeping it concealed in his pocket.  With his knife concealed but ready for action, defendant positioned himself in front of Ryan and within arm's reach.  He proceeded to tell Ryan "fucker, just leave" and "smirk[ed]" at him.  The jury could have concluded that defendant's conduct was intended to provoke a fight so that defendant would have an opportunity to use his knife on Ryan.

Defendant also contends that "the instruction is overbroad" because it used the word "quarrel," which the jury could have understood to include a "verbal argument."  This argument ignores the nature of the instruction.  This instruction tells the jury that a defendant may not intentionally "provoke [ ]" a response by the victim so as to "create an excuse to use force."  A defendant who provokes a physical or verbal response by a victim solely to "create an excuse to use force," and then counters the victim's response with force, is not defending himself when he uses force.  The intent element of the instruction is not the intent to "quarrel" but the intent to create an excuse to use force.  If defendant did not intend to create an excuse to use force, then the instruction would not apply.  If he intended to provoke a verbal response that excused his use of force, he could not rely on that response to his provocation to excuse his use of force.  By restricting its ambit to those responses which were intended to create an excuse to use force, the instruction avoids the type of overbreadth that defendant claims it has.

Lopez, 2011 WL 3568553, at *23 (footnote omitted).

The California Court of Appeal's decision was not unreasonable.  There was sufficient evidence to warrant issuance of this instruction.  Specifically, Petitioner took two knives and went to the apartment, unfolded a knife in his pocket, and confronted the victim.  There was no error in the trial court issuing an instruction regarding contrived self-defense, and Petitioner has not shown that the state court opinion was unreasonable based on these facts.  Nor was the instruction given by the trial court overbroad

37

for using the word "quarrel."  As noted by the appellate court, the intent to "quarrel" is not the basis for the intent element of the instruction; rather, the quarrel which provoked a verbal response that led Petitioner to use force with the knife already ready in his pocket was the basis for the instruction.  The instruction was not overbroad and Petitioner has not demonstrated that he is entitled to relief.

3

Petitioner argues that the trial court erred in instructing the jury regarding unjoined perpetrators because it chilled jurors' consideration of whether Vincent's testimony from the preliminary hearing was influenced by the possibility that he could be prosecuted.  The state appellate court described the relevant background and denied this claim:

> Defendant claims that the trial court prejudicially erred when it instructed the jury with CALCRIM No. 373 regarding unjoined perpetrators.  The court instructed the jury: "The evidence shows that other persons may have been involved in the commission of the crime charged against the defendant.  There may be many reasons why someone who appears to have been involved might not be a co-defendant in this particular trial.  You must not speculate about whether those other persons have been or will be prosecuted."  He contends that this instruction was inappropriate because Vincent's testimony was introduced at trial.  Defendant argues that this instruction improperly "chills jurors' consideration of significant accomplice witness bias going to credibility."
>
> There is no merit to defendant's claim.  The trial court explicitly told the jury that "[t]he testimony of Vincent Lopez [that] has been read to you ... [¶] ... must [be] evaluate[d] ... by the same standards that you would evaluate any other testimony of a witness who has testified here in court."  "When the instruction [on unjoined perpetrators] is given with the full panoply of witness credibility and accomplice instructions, as it was in this case, a reasonable juror will understand that although the separate prosecution or nonprosecution of coparticipants, and the reasons therefor,

38

1   may not be considered on the issue of the charged defendant's
    guilt," this limitation does not preclude the jury from
2   considering "evidence of interest or bias in assessing the
    credibility of prosecution witnesses."  (<u>People v. Price</u>
3   (1991) 1 Cal. 4th 324, 446.)

4       This was not a case in which a coparticipant testified for the
        prosecution and incriminated the defendant.  Vincent's
5       testimony was a complete denial of any knowledge about these
        events, which, if believed, did not inculpate defendant at
6       all.  Of course the prosecutor argued to the jury that Vincent
        had lied and that he had been with defendant when defendant
7       killed Ryan.  However, the evidence of Vincent's participation
        in the crime was not Vincent's testimony and did not depend on
8       whether the jury found Vincent to be a credible witness.
        Instead, the determination of whether Vincent had participated
9       in the crime depended on the testimony of Rosa and Diaz.

10      CALCRIM No. 373 correctly told the jury that it should not
        speculate about whether Vincent would be prosecuted for this
11      crime.  That was indeed irrelevant to the issues before the
        jury at this trial.  The jury was given the full panoply of
12      witness credibility instructions and specifically told to
        apply those instructions to Vincent's testimony. Under these
13      circumstances, the trial court's instruction of the jury with
        CALCRIM No. 373 was not likely to mislead the jury regarding
14      its duty to evaluate the credibility of Vincent's testimony.

15  <u>Lopez</u>, 2011 WL 3568553, at *24.

16      Petitioner argues that due to the instruction the jury could

17  not judge the credibility of Vincent's testimony.  His claim is

18  meritless because he has not shown the state court's denial of this

19  claim was an unreasonable application of Supreme Court authority.

20  The jury was instructed to consider Vicent's testimony using the

21  same standards as for other witnesses.  Petitioner has not shown

22  that there was any instruction that urged the jury to not consider

23  whether Vincent had a motive to lie.  Moreover, Vincent did not

24  incriminate Petitioner with his testimony; rather, he denied

25  involvement and stated he had no knowledge of whether Petitioner was

26  involved.  This claim is denied.

27

28
                                    39

4

Petitioner argues the trial court's instruction on voluntary intoxication was erroneous because it stated that the jury "may" consider the evidence instead of stating that the jury "must" consider it.   The California Court of Appeal denied this claim:

> Defendant claims on appeal that the trial court's voluntary intoxication instruction was prejudicially inadequate because it instructed the jury that it "may" consider such evidence rather than that it "must" consider such evidence.
>
> At the instruction conference, defendant's trial counsel stated: "I, for tactical reasons, do not want to argue voluntary intoxication in this case; I don't think it's a viable argument.  I don't think it would be beneficial to my client to use the argument."  Nevertheless, the court gave a voluntary intoxication instruction.  "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way.  You may consider that evidence only in deciding whether the defendant acted with deliberation or premeditation or the defendant acted with express malice aforethought. [¶] A person is voluntarily intoxicated if he or she becomes intoxicated by willingly using an intoxicating drink or other substance, knowing it could produce an intoxicating effect or willingly assuming the risk of that effect.  You may not consider evidence of voluntary intoxication for any other purpose."  Defendant's trial counsel argued to the jury: "The D.A. made a big deal about, well, if [defendant] was going to claim voluntary intoxication, there's a jury instruction.  *It has nothing to do with the case.  That's not important to what we're talking about here.*" (Italics added.)
>
> Any inadequacy in the voluntary intoxication instruction could not have played a role in the jury's deliberations because defendant's trial counsel explicitly told the jury that it was irrelevant and "has nothing to do with the case."  We reject defendant's claim that the trial court's voluntary intoxication instruction was prejudicially erroneous.

Lopez, 2011 WL 3568553, at *24-25.

The California Court of Appeal's decision was not unreasonable.  Petitioner's trial counsel specifically told the jury not to consider the instruction and that voluntary intoxication had

40

nothing to do with the case.  It is not likely the jury would have considered the instruction based on these statements.  Regardless, the California Supreme Court has upheld this instruction and found that a jury may, but is not required to, consider evidence of voluntary intoxication.  <u>People v. Mendoza</u>, 18 Cal. 4th 1114, 1133-34 (1998).  Nor has Petitioner shown that the inclusion of this instruction violated due process.  The claim is denied.

5

Petitioner asserts that the trial court erred by adding an extra sentence to the accomplice liability instruction regarding the natural and probable consequences doctrine.  This claim was denied on direct appeal:

> Defendant complains that a sentence regarding natural and probable consequences was erroneously included in the aiding and abetting instructions.

> The court instructed the jury: "A person may be guilty of a crime in two ways: [¶] One, he or she may have directly committed the crime.  I will call that person the perpetrator. [¶] Two, he or she may have aided or abetted a perpetrator who directly committed a crime. [¶] A person is equally guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator who committed it.  *Under some specific circumstances, if the evidence establishes aiding and abetting of one crime, a person may be found guilty of other crimes that occurred during the commission of the first crime.* [¶] To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the [prosecution] must prove that: [¶] One, the perpetrator committed the crime; [¶] Two, the defendant knew the perpetrator intended to commit the crime; [¶] Three, before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] Four, the defendant's words or conduct did in fact aid and abet the person's commission of the crime. [¶] Someone aids and abets a crime if he or she knows the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage or instigate the perpetrator's commission of that crime."  (Italics added.)

41

> While it is clear that the trial court mistakenly included the one sentence italicized above in the aiding and abetting instructions, it is not possible that defendant was prejudiced by its inclusion.  Defendant admitted that he was the actual perpetrator who stabbed Ryan to death.  It was undisputed that defendant was not an aider and abettor and that no crime other than murder was ever contemplated. Hence, under any standard of review, the trial court's mistake was harmless.

Lopez, 2011 WL 3568553, at *25-26 (footnote omitted).

Petitioner is not entitled to relief on this claim. Petitioner testified that he was the direct perpetrator of the crime and repeatedly stabbed the victim.  While it was a mistake to include this aspect of the instruction, any error was harmless as noted by the state court.  There were no other crimes Petitioner was alleged to have been involved in for this instruction to apply. This claim is denied.

### E

Finally, Petitioner contends that the cumulative effect of the errors described above deprived him of his right to a fair trial.  The state appellate court denied the claim stating, "[t]he only errors that the trial court made were giving an instruction that used the phrase 'subjective reasonableness' rather than 'subjective belief' and including in the aiding and abetting instruction an irrelevant sentence regarding natural and probable consequences.  As we have already explained, the former error was harmless.  The latter error plainly had no impact whatsoever on the jury as it had no application to the undisputed facts. Thus, there was no prejudice to cumulate." Lopez, 2011 WL 3568553, at *26.

In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect

42

of several errors may still prejudice a defendant so much that his conviction must be overturned.  See Alcala v. Woodford, 334 F.3d 862, 893-95 (9th Cir. 2003) (reversing conviction where multiple constitutional errors hindered defendant's efforts to challenge every important element of proof offered by prosecution).  Cumulative error is more likely to be found prejudicial when the government's case is weak.  See, e.g., Thomas v. Hubbard, 273 F.3d 1164, 1179-80 (9th Cir. 2002), overruled on other grounds by Payton v. Woodford, 299 F.3d 815, 829 n.11 (9th Cir. 2002) (noting that the only substantial evidence implicating the defendant was the uncorroborated testimony of a person who had both a motive and an opportunity to commit the crime).  However, where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation.  See Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011).  Similarly, there can be no cumulative error when there has not been more than one error.  United States v. Solorio, 669 F.3d 943, 956 (9th Cir. 2012).

This Court has not found any constitutional errors let alone multiple errors that cumulatively would allow for reversal.  See Hayes, 632 F.3d at 524.  Moreover, there was overwhelming evidence implicating Petitioner in the murder and refuting his claim of self-defense.  This claim is denied.

V

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

Further, a Certificate of Appealability is DENIED.  See

Rule 11(a) of the Rules Governing Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals for the Ninth Circuit under Rule 22 of the Federal Rules of Appellate Procedure. See Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk is directed to enter Judgment in favor of Respondent and against Petitioner, terminate any pending motions as moot and close the file.

IT IS SO ORDERED.

DATED      5/18/2015
                                   THELTON E. HENDERSON
                                   United States District Judge

G:\PRO-SE\TEH\HC.13\Lopez0649.hc.wpd

44